# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

WAFA SADER,

        Plaintiff,         CASE NO. 17-13714
                                  HON. DENISE PAGE HOOD

v.

PROMEDICA HEALTH SYSTEMS, INC.,

        Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#21]

### I. BACKGROUND

On November 15, 2017, Plaintiff Wafa Sader ("Sader") filed a Complaint against ProMedica Health Systems, Inc. ("ProMedica") alleging national origin discrimination under Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e *et seq.*, (Count I) and national origin discrimination and religious discrimination under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") (Counts II-III). (Doc # 1) On November 2, 2018, Sader filed a Motion for Leave to File First Amended Complaint (Doc # 14) and asked the Court to add a claim of race discrimination under 42 U.S.C § 1981 to her Complaint. The Court denied Sader's Motion on August 21, 2019. (Doc # 29)

On January 7, 2019, ProMedica filed a Motion for Summary Judgment. (Doc # 21) A Response and Reply have been filed. (Doc # 25; Doc # 27) A hearing on this Motion was held on May 29, 2019.

The facts are as follows. Sader, who identifies as a Muslim of Palestinian and Arab descent, came to the United States in the 1970s to attend graduate school. (Doc # 25-2, Pg ID 668) She received her master's degree in work related to oncology and is currently a registered nurse ("RN") who is licensed to practice in Michigan, Ohio, and Hawaii. (*Id.*) In or about May 1990, Sader began working as an RN for ProMedica[1] as a member of its Med-Surgical Unit. (Doc # 1, Pg ID 3) Sader transferred to ProMedica's oncology department two years later and would remain there until her termination in March 2016. (Doc # 25-2, Pg ID 681)

RNs in ProMedica's oncology department are primarily responsible for providing education to their patients prior to the start of their radiation therapy and assessing patients' conditions and identifying any potential variations in their clinical conditions. (Doc # 25-3, Pg ID 917, 925) RNs in this department are also required to be available to triage patient concerns and relay communications and clinical issues to physicians for further direction and orders. (*Id.* at 917.) Additional job duties of an oncology RN at ProMedica include: assessing patients for toxicity,

---

[1] ProMedica was formerly known as Bixby Hospital. (Doc # 25-2, Pg ID 681)

providing supportive care in connection with patient treatment during patients' follow-up periods, and participating in on-treatment visits ("OTV"), where RNs and physicians see patients to discuss side effects of their treatments on a weekly basis. (*Id.* at 917, 919, 921.)

Sader alleges that she faced many incidents of discrimination on the basis of her national origin and religion, many of which were caused by her supervisor, Darcel Shankle ("Shankle"). (Doc # 25, Pg ID 629) Shankle would allegedly speak negatively about Sader's religion and national origin as well as constantly state that women were not treated fairly in Sader's culture. (Doc # 25-2, Pg ID 682, 697) Sader also alleges that Shankle asked her why she did not wear a hijab and inquired about her marriage. (*Id.* at 683.) Shankle allegedly told Sader that she did not believe in God, even though Sader explained to Shankle that "Allah" just means "God" in Arabic and told her that Allah and God are the same deity. (*Id.*)

Sader additionally claims that there were other specific events that demonstrate that she was discriminated against by Shankle. First, Sader alleges that following September 11, 2001 ("9/11"), Shankle looked at Sader, pointed her finger in Sader's face and said, "This is your people celebrating what happened." (*Id.*) At a later date, Shankle asked Sader if Palestinians were still celebrating 9/11. (*Id.*) Second, there was an incident in which Shankle questioned Sader's loyalty to America when she did not donate shoeboxes for the veterans who were overseas.

(*Id.* at 695.) Sader told Shankle that she was offended by her comments, but Shankle allegedly shrugged her shoulders and walked away. (*Id.* at 696.) Third, Sader asserts that Shankle denied Sader's request for the day off to go to her mosque on Eid, but acknowledges that she did not ask for a religious accommodation. (*Id.* at 684.) Fourth, Sader alleges that she was not permitted to use "flex scheduling" although other employees were given the ability to take advantage of this type of scheduling. (*Id.* at 708.)

According to Sader, she raised concerns about Shankle's conduct to many individuals. Sader claims that she complained to Carol Boyce ("Boyce"), Shankle's director, that Sader was being treated differently than her colleagues. (*Id.* at 682.) Boyce suggested that Sader should keep a record of her interactions with Shankle. (*Id.* at 681.) Sader additionally asserts that she complained about Shankle to Kathy Greenlee (Shankle's manager), Kim Langley (an employee in ProMedica's Human Resources Department), Cathy Davis (ProMedica's Director of Labor Relations), and Amy Wilson (another ProMedica employee). (Doc # 25, Pg ID 630-631) These workers similarly said that Sader should document all of the incidents that she faced. (*Id.* at 631.) Finally, on August 3, 2014, Sader sent Randy Oostra ("Oostra"), ProMedica's CEO, a letter complaining that Sader was discriminated against in the form of working overtime and missing lunches. (Doc # 25, Pg ID 633) While Sader, Davis, and her supervisor, Anita Stolaruk ("Stolaruk") met to discuss the letter,

4

Sader claims that nothing else came of the letter after their conversation. (*Id.* at 633-634.)

Sader alleges that she was also subjected to discrimination by Stolaruk. Stolaruk allegedly did not allow Sader to attend computer training, even after multiple requests to take advantage of the computer trainings that were being offered. (Doc # 25-2, Pg ID 724.) Sader contends she was the only person in her department not permitted to receive computer training. (*Id.*) There were also numerous disciplinary actions that Sader faced because of Stolaruk, and Sader argues that these actions were due to discrimination. The disciplinary actions were mainly based on Sader being disciplined for working unapproved overtime and skipping lunch breaks. (Doc # 25, Pg ID 635) Sader claims that there is no evidence that similarly-situated employees were disciplined for working unapproved overtime. (*Id.* at 636.) Sader alleges that these disciplines were a part of Stolaruk's attempt to ensure that Sader was terminated. (*Id.*)

Sader also claims other employees discriminated against her. In one incident, Sara Fruth ("Fruth"), a co-worker, left documents by a printer that stated that Islam is a religion of terrorists, bloodshed, war, and of intimidating women. (*Id.* at 697.) ProMedica disciplined Fruth for her actions, but Sader contends that it was for the inappropriate use of ProMedica's electronic equipment, not due to the documents' offensive content. (Doc # 25, Pg ID 632) Another incident transpired in 2010, in

5

which two FBI agents came to ProMedica to interrogate Sader. (Doc # 25-2, Pg ID 701) The FBI Agents took Sader to the cafeteria for an hour and asked her about her heritage, being a Palestinian sympathizer, and her willingness to be a suicide bomber. (*Id.*) Sader was informed that a co-worker called the FBI Agents to complain that Sader might cause harm to her department. (*Id.*) Lastly, Sader alleges that Kellie Chapman ("Chapman"), the lead radiation therapist, would ask questions and comment about her religion and national origin one to two times a week. (*Id.* at 720-721.) Sader claims that she would ask Chapman for her assistance with obtaining a flex schedule, but not only was Chapman unwilling to help her, she would schedule Sader's appointments with patients five minutes before Sader's lunch break, which led to her being written-up. (*Id.* at 308-309, 412.)

At ProMedica, employees, including RNs, are subjected to a progressive discipline policy ("Policy"). (Doc # 21-4, Pg ID 377) The Policy consists of four levels of discipline: (1) verbal reminder; (2) written reminder; (3) decision-making leave ("DML"); and (4) termination. (*Id.*) Once an employee reaches the DML level, he or she must adhere to a "total performance commitment." (*Id.*) The Policy dictates that an employee will be terminated if he or she is formally disciplined during the DML stage. (*Id.*) Under the Policy, management may skip levels of discipline as "the use of formal levels of discipline is not mandatory and is within the sole discretion of the organization." (*Id.* at 377-378.) Employees may be

"skipped forward" directly to the termination stage for various offenses that include: insubordination, falsifying records, and inability to perform their job functions. (*Id.* at 378.) Sader acknowledged that she was aware of the Policy. (Doc # 25-2, Pg ID 740)

Throughout the course of Sader's employment, she was disciplined on several occasions due to her workplace conduct. On October 20, 2014, Sader received a first level verbal reminder due to the lack of cooperation and teamwork that she exhibited. (Doc # 21-3, Pg ID 355; Doc # 25-2, Pg ID 739) The report regarding the verbal reminder indicates that Sader "displayed negativity toward other team members, behaved unprofessionally, failed to support job expectations, which all contributed to a breakdown in communications within the department." (Doc # 21-3, Pg ID 355) Another oncology RN, Christina Bartlett ("Bartlett"), whose ethnicity is "white" was issued a verbal reminder for the same behaviors in October 2014. (*Id.* at 356.)

On May 19, 2015, Sader received a second level written reminder. (*Id.*) The written reminder was issued because she "stayed past her budgeted hours without approval on 15 separate occasions." (*Id.*) The written reminder also identified one incident where Sader disregarded ProMedica policy by pulling a patient out of a vehicle for an unscheduled OTV that a physician told her was unnecessary. (*Id.*) It was highlighted in the written reminder that Sader disregarded a direction to have

the lab perform a blood draw on a patient. (*Id.*) ProMedica notes that Sader was coached about her actions, rather than disciplined, by Stolaruk prior to the issuance of the written reminder. (*Id.*)

Even after Sader was given a written reminder, she neglected to abide by ProMedica's policies. Stolaruk again coached Sader in July 2015 about "staying within her budgeted hours, receiving approval for any overtime, and the requirement to take a lunch break." (*Id.* at 357.) In September and November 2015, Stolaruk expressed her concerns to Sader about Sader's failure to complete certain mandated online courses that were past due. (*Id.*) Despite the written reminder and coaching, Sader's conduct continued, which resulted in her receiving a DML on November 16, 2015. (*Id.*) On her DML, Sader admitted that she did not take her lunch break and left at 5:30 p.m. (an hour after any patients had been seen and after the last physician left) without approval. (*Id.*) On January 20, 2016, Sader ignored Chapman's instruction to refrain from working overtime and decided to stay late at work anyway. (Doc # 25-2, Pg ID 744)

Sader's termination occurred in March 2016 because she once again disregarded ProMedica's policies. (Doc # 21-3, Pg ID 358) On March 16, 2016, Sader worked outside of the scope of her nursing license with respect to a patient with the initials, G.K., a male cancer patient. (Doc # 21-2, Pg ID 353; Doc # 21-3, Pg ID 358) According to Dr. Dhaval Parikh ("Dr. Parikh"), Sader stayed at work

after her shift was scheduled to end, and contacted G.K. for a routine one-month follow-up. (*Id.*) G.K. expressed to Sader that he was experiencing mild headaches, and Sader instructed G.K. to increase his steroid dosages.[2] (Doc # 21-2, Pg ID 353) The instructions that Sader gave to G.K. were made without a physician's order and were inconsistent with the patient's discharge instructions. (*Id.*) Dr. Parikh said in his sworn affidavit that he would not have increased G.K.'s dosages to the amount that Sader authorized, and that even if Sader could not reach him personally to seek approval for her actions, she should have contacted the on-call physician for confirmation in regard to her instructions given to G.K. (*Id.* at 354.)

The decision to terminate Sader was made collectively by several individuals. (Doc # 21-5, Pg ID 404) Sader was terminated from her position on March 30, 2016 due to her "multiple violations of policies and procedures." (Doc # 21-5, Pg ID 404; Doc # 25-21) Following Sader's termination, Stolaruk discovered several items in Sader's desk, including: a prescription pad, RN communication logs containing a patient's personal health information ("PHI"), a patient's discharge report with PHI, several handwritten notes with a patient's name and PHI, test results and patient schedules, and chart notes constituting further violations of ProMedica protocols.

---

[2] Although Sader initially claimed to be present when Dr. Ryan Jin ("Dr. Jin") gave G.K. instructions about his medication in the event of headaches, it was determined that Dr. Jin was not G.K.'s discharging doctor. (Doc # 21-6, Pg ID 406) It also was determined that Sader was not present when G.K. was discharged. (Doc # 21-3, Pg ID 358)

9

(Doc # 21-3, Pg ID 359-360) Stolaruk claims that because Sader possessed these items, she was also in violation of ProMedica's protocols. (*Id.*) Sader decided to file a grievance with her Union to contest her termination, but her Union declined to bring the matter to arbitration after its determination that there was no evidence to support her claim of discrimination. (Doc # 21, Pg ID 321) ProMedica brought a licensing action against Sader through the State of Michigan, but the Board of Nursing ultimately decided that Sader did not practice outside the scope of her license. Sader's Michigan license remains active. (Doc # 25-23; Doc # 25-25)

## II.   ANALYSIS

### A. Standard of Review

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). A fact is material if it could affect the outcome of the case based on the governing substantive law. *Id*. at 248. A dispute about a material fact is genuine if on review of the evidence, a reasonable jury could find in favor of the nonmoving party. *Id*.

The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmoving party must "go beyond the pleadings

and … designate specific facts showing that there is a genuine issue for trial." *Id*. at 324. The Court may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Conclusory allegations do not create a genuine issue of material fact which precludes summary judgment." *Johari v. Big Easy Restaurants, Inc.*, 78 F. App'x 546, 548 (6th Cir. 2003).

When reviewing a summary judgment motion, the Court must view the evidence and all inferences drawn from it in the light most favorable to the nonmoving party. *Kochins v. Linden–Alimak, Inc*., 799 F.2d 1128, 1133 (6th Cir. 1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**B. Sader's Discrimination Claims**

Sader argues that she was discriminated and retaliated against under Title VII and the ELCRA due to her national origin and religion. Under both Title VII and the ELCRA, a "plaintiff bringing a[n] ... employment discrimination claim must present either direct evidence of discrimination, or circumstantial evidence that allows for an inference of discriminatory treatment." *Reeder v. City of Wayne*, 177 F.Supp.3d 1059, 1079 (E.D. Mich. 2016) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003) ).

Sader concedes that there is only circumstantial evidence to support her claims, so the Court will address her claims accordingly. (Doc # 25, Pg ID 644)

When a plaintiff seeks to prove racial discrimination by circumstantial evidence, the court applies the *McDonnell Douglas* framework. *Johnson,* 215 F.3d at 572. First, a plaintiff must establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) that she was qualified for the job and performed her duties satisfactorily; (3) that despite her qualifications and performance, she suffered an adverse employment action; and (4) that she was replaced by a person outside of the protected class or was treated less favorably than a similarly situated individual outside of the protected class. *Id.* at 572-573. If a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Hawthorne-Burdine v. Oakland Univ.*, 158 F. Supp. 3d 586,

604 (E.D. Mich. 2016) (internal citations omitted) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "Circumstantial evidence ... is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler*, 317 F.3d at 570.

Once the defendant offers a legitimate, non-discriminatory reason for its conduct, the burden shifts back to the plaintiff to demonstrate that the defendant's stated basis for the adverse employment action is a pretext designed to mask discrimination. *Texas Dept. Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas*, 411 U.S. at 805.

A plaintiff can establish pretext by producing evidence sufficient for a jury to reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against the plaintiff. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) ("A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct").

ProMedica concedes that for the purposes of the instant Motion, the first, second, and third prongs of the *McDonnell Douglas* framework are satisfied, but disputes that the fourth prong has been met. ProMedica argues that there is no evidence that Sader was replaced by an employee who was not Muslim, Palestinian, or Arabian, or that Sader was treated differently than similarly situated individuals

outside of her protected class.  ProMedica also contends that there are no other comparable nurses that engaged in the same types of cumulative behaviors and/or experienced the repeated coaching that Sader received.

In response, Sader claims that two women, Bartlett and Amy Lester ("Lester"), replaced her and proclaims that neither woman is Muslim, Palestinian, or Arabian.  ProMedica's reply to Sader's argument is that Sader has not supported her position that either of these employees are not Muslim, Palestinian, or Arabian.  ProMedica asserts that because Sader has not proven that Bartlett or Lester is not a member of any of the same protected classes as Sader, the Court should find that she cannot make out her *prima facie* case.

The Court finds that there is a genuine issue of material fact regarding whether Sader has satisfied the fourth prong.  For purposes of this Motion, Sader has established that she can meet the fourth prong by establishing that she was replaced by a person outside of her protected class.  As the Court must view the evidence in the light most favorable to Sader, the Court finds that Sader has offered evidence that two individuals, Bartlett and Lester, who are allegedly outside of her protected class, replaced her.  ProMedica challenges that Sader has not *conclusively established* that Bartlett and Lester are outside her protected classes, but ProMedica has not offered any evidence showing that Lester and Bartlett are within Sader's

protected classes. Therefore, ProMedica has not met its burden on a motion for summary judgment, and Sader has satisfied her *prima facie* case at this stage.

Since Sader has made out her *prima facie* case, the Court must consider whether ProMedica has articulated a legitimate, nondiscriminatory reason for terminating Sader. *Hawthorne-Burdine*, 158 F. Supp. 3d at 604. ProMedica argues that it has presented substantial evidence showing that it terminated Sader due to her repeated disregard for its policies. In support of its contention, ProMedica claims that by her own admission, Sader violated numerous policies even after she was given multiple opportunities to correct her behavior. ProMedica cites to several cases in which courts have found there to be legitimate, non-discriminatory reasons for terminations "following an employee's repeated failure to adhere to company directives." *See, e.g., Tafty v. CVS Pharmacy*, No. 11-CV-14628, 2012 WL 5874782, at *6 (E.D. Mich. Nov. 20, 2012).

The Court finds that ProMedica has satisfied its burden of presenting a legitimate and nondiscriminatory reason for terminating Sader. ProMedica has articulated that Sader was terminated due to her repeated violations of ProMedica's policies. Sader does not dispute that she continued to fail to follow ProMedica's policies, even after she had been coached and talked to about her behavior.

The Court must now determine whether there is evidence that ProMedica's legitimate, nondiscriminatory reason for Sader's termination was pretextual. *See Dews*, 231 F.3d at 1021. The Court concludes that a reasonable factfinder could determine ProMedica's reason to be pretextual. The record reflects that several individuals took discriminatory actions against Sader. The Court cannot find that *no reasonable jury* could make the connection between any of those discriminatory actions and Sader's termination, even if that jury determined that ProMedica's offered reason for terminating Sader was facially legitimate and nondiscriminatory. Therefore, the Court **DENIES** ProMedica's Motion.

The Court notes that in Sader's Response, she claims that she has valid hostile work environment claims. The Court will not address the validity of such arguments because Sader did not include those allegations in her Complaint.

### III. CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Doc # 21) is **DENIED**.

s/Denise Page Hood
United States District Court Judge

DATED: August 27, 2019